UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14cv549-FDW

| VENISHA C. BAJJA, | ) | |
|---|---|---|
| Petitioner, | ) | |
| vs. | ) | **ORDER** |
| FRANK L. PERRY[1], | ) | |
| Respondent. | ) | |

**THIS MATTER** is before the Court upon Venisha C. Bajja's pro se Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Also before the Court are Respondent's Motion for Summary Judgment (Doc. No. 6) and Petitioner's motion for release of documents (Doc. No. 11).

**I. BACKGROUND**

Petitioner is a prisoner of the State of North Carolina, who, on March 15, 2012, was convicted of first-degree murder after a jury trial in Gaston County Superior Court. The North Carolina Court of Appeals summarized the evidence presented at trial:

> On 21 February 2011, Ms. Crystalyn Sanders ("Sanders") was in her bedroom getting ready for bed when she heard "a lot of arguing outside." She looked out her window and noticed two women standing across the street wearing long, white t-shirts. The two women were later identified as Ms. Cambria Cannon ("Decedent") and Ms. Cecilia Moses ("Moses"). As Decedent and Moses argued with Defendant,

---

[1] Consistent with Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts, Frank L. Perry, Secretary of the North Carolina Department of Public Safety has been substituted for "State of North Carolina" as Respondent in this case. See Rule 2(a), 28 U.S.C. folio § 2254 (requiring a petition for writ of habeas corpus name the person who has immediate custody of the petitioner as the respondent in the action); see also Rumsfeld v. Padilla, 542 U.S. 426, 434–47 (2004) (stating the writ should be directed to the "person who has the immediate custody of the party detained, with the power to produce the body of such party before the court or judge").

1

who was standing across the street from them on the steps leading into her home, Moses was attempting to calm Decedent down. The argument continued and Defendant came down her front steps toward the street. At the same time, Moses and Decedent headed toward Defendant. Sanders testified that, at that point, Decedent appeared as if she was going to start fighting with Defendant. Once Moses and Decedent reached Defendant, however, they began to run in the other direction. As they ran, Defendant "raise[d] her hand and [shot] the gun," which emitted a "blue flame."

A shot "rang out," and Decedent fell down in the street. At that moment, Defendant ran back into her house and, after a minute, ran back out to where Decedent was lying. Defendant and Moses hovered over Decedent for a few minutes before a white car drove up. The driver asked if they needed help and, after hearing their response, drove off. No one called out for help, but Defendant stayed beside Decedent until the paramedics came.

Defendant had known Decedent for about eight years and had been in a relationship with her for more than six of those years. They dated exclusively from 14 June 2004 through January of 2010 before breaking up due to excessive fighting. They got back together in September of 2010 and continued to see each other up to the night of the shooting, no longer dating exclusively. That night, with Decedent's consent, Defendant was dating Moses. In the hours leading up to the shooting, all three women were hanging out and drinking at Defendant's cousin's home. As the evening came to a close, the three women returned to Defendant's house and tensions rose over the sleeping arrangements.

Decedent and Moses wanted the three of them to share a bed together, but Defendant refused. An argument broke out, and Defendant went outside to get away. Moses and Decedent followed her, and Defendant returned inside—leaving them out. Telling her that they wanted back in, Decedent and Moses kicked on the door until they were admitted. One of them began to pull Defendant's hair, and Defendant retreated into her bedroom. Decedent followed her and began cursing, pulling Defendant's hair at the same time. Moses was eventually able to pull Decedent off of Defendant, whose shirt had been ripped, and the two of them went back outside. Shortly thereafter, Defendant followed them outside and asked them to leave. A drink was thrown at Defendant, who then slammed her front door closed, again leaving the two women outside. The entire argument lasted between thirty and forty-five minutes./2/

> /2/Though Defendant testified that she "had scratches and stuff and bruises" as a result of the fight, the investigating detective testified to the contrary, noting that there was no swelling on her face, no cuts or contusions, no blood, and no scratches.

2

Angry about her hair, Defendant changed clothes and retrieved her gun from under the bed. She had purchased the gun for protection earlier that month because someone had broken into her home. Gun in hand, she went outside and cursed at Decedent. Defendant testified that she took the gun with her to frighten Moses and Decedent into leaving. Defendant said that she started bouncing the gun in her hand as Decedent was walking toward her. All of a sudden, she heard a "popping sound" and saw Decedent running. She heard Decedent say "[y]ou hit me" and watched her fall onto the curb and into the street. Defendant testified that the shooting was accidental and that she did not know the gun was loaded. When asked why she pulled the trigger, Defendant stated that the gun "ended up going off while it was in my hand. I didn't even realize it." Defendant also testified that there was no blue flame and no recoil from the shot.

After Decedent fell, Defendant rushed back to her house and hid the gun inside a vacuum cleaner box located in her closet. She testified that she did this because she was worried that the police would not let her go with Decedent to the hospital if they knew about the gun. She then went out to Decedent and told Moses to call 911. When the police arrived, Defendant told them that Decedent was injured in a drive-by shooting and confirmed that assertion shortly thereafter in a written statement. When the detective informed Defendant that "accidents happen[ ]," however, she told him she would take him inside her home and show him where her gun was. When they got inside, Defendant changed her mind and informed the detective that she did not have a gun. Having just submitted to a gunshot residue test, she stated that she had fired a gun earlier that day, but did not own or have one in the house. Then, when the officers found the gun in the vacuum cleaner box, Defendant blurted out: "I didn't mean to shoot her." When asked at trial why she was not forthright with the officers from the beginning, Defendant reiterated that she had wanted to go to the hospital with Decedent and believed that telling the truth would make that difficult or impossible.

Once police arrived at the scene of the shooting, an officer began to look for shell casings near Defendant's house. Directly in front of the house, near the curb, the officer found one such casing./3/ Another officer confirmed that the casing was found, specifically, about thirty feet from the front door of the house and seventy-six feet from where Decedent had fallen. The State's forensic firearms and toolmark identification expert testified that the casing found near the house was a match to the three unfired cartridges in Defendant's gun and the bullet found in Decedent's body. She further testified that Defendant's gun, when fully loaded, could hold six cartridges.

/3/No other shell casings were discovered.

The State's expert also clarified that Defendant's gun was a semi-automatic, single-action weapon with a manual safety switch. A semi-automatic weapon does not require the user to reload a new cartridge for each separate shot; a single-action

3

weapon is one that must be cocked before it can be used. Such a weapon is cocked by "pulling the slide back and then ... releasing it forward." When the expert tested the gun, she noted that there was some difficulty getting the slide to retract "due to excessive ... lubricant buildup." She could not recall, however, "whether it was just really slow or whether it didn't move at all." The expert also noted that the gun's trigger required four pounds of pressure in order to fire consistently.

Decedent died from her injuries at 4:49 a.m. on 22 February 2011. After performing the autopsy, the State's medical examiner confirmed that Decedent "died from bleeding to death from the gunshot wound." She testified that the bullet entered Decedent's left flank/5/ and ended up over her right hip toward the front of her body. Thus, the bullet crossed both from the left side of the body to the right and from the back of the body to the front, at a downward angle. The medical examiner also noted that Decedent had a bruise around her left eye, which had become swollen, and had bruises on her left upper and lower lips. She also had at least three superficial lacerations on the left side of her neck.

> /5/The "flank" is "[t]he part of the body of a person . . . between the last rib and the hip; the side." American Heritage College Dictionary 517 (3d ed.1997).

The State offered evidence that at least three calls were placed to 911 after the shooting, all before midnight, on 21 February 2011. At 11:53:05 p.m., the first caller reported that "someone's out here shooting." She informed the operator that there were three females outside arguing, one of whom was shooting, and that she heard two gunshots. The second call was made less than a minute later, at 11:53:48 p.m. The caller reported that someone had been shot and was lying on the side of the road. She also stated that she heard "like three or four gunshots," which caused her to jump up out of bed. About a minute after that, at 11:55:02 p.m., Moses called 911 to request an ambulance. When asked if the person who shot Decedent was still there, Moses said, "No, they just rolled by." At the same time, another voice called out, "No, they just rolled past."/7/ At that point, the other party took over the phone and became defensive and angry with the operator, eventually hanging up.

> /7/The recording suggests—and the State argues—that this party was Defendant.

State v. Bajja, 745 S.E.2d 375, 2013 WL 2431039 at *1-3 (N.C. Ct. App. 2013) (unpublished)

(footnotes 1, 4 and 6 omitted). Petitioner moved to dismiss the charge of first-degree murder at

the close of the State's evidence, alleging that the State had failed to prove premeditation and

deliberation. That motion was denied. Petitioner renewed her motion at the close of all the evidence, and it was again denied. She was sentenced to life in prison without parole.

Petitioner gave notice of appeal in open court at the end of the trial. She raised a single issue on direct appeal: "Whether the evidence, viewed in the light most favorable to the state, was insufficient to permit a reasonable juror to find beyond a reasonable doubt that Defendant Bajja committed first degree, premeditated and deliberate murder?" (Def.-Appellant's Br., Resp't's Ex. H, Doc. No. 7-12.) The North Carolina Court of Appeals denied the appeal on June 4, 2013. State v. Bajja, 2013 WL 2431039 at *7. Her subsequent petition for discretionary review ("PDR") in the North Carolina Supreme Court was denied. State v. Bajja, No. 311P13, 747 S.E.2d 554 (N.C. Aug. 27, 2013) (mem.). As of the date of this Order, there is no evidence that Petitioner has filed a motion for appropriate relief ("MAR") in the state court.

Petitioner filed the instant habeas petition (Doc. No. 1) in federal district court on September 30, 2014 (Doc. No. 1-2). After conducting an initial review required by Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts, this Court ordered Respondent to file a response to the amended Petition. Respondent filed a Response (Doc. No. 5), Motion for Summary Judgment (Doc. No. 6), and supporting memorandum of law (Doc. No. 7) with exhibits. In accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), Petitioner was provided time to respond to the Motion for Summary Judgment. (Doc. No. 9.) At her request, Petitioner was granted an extension of time to respond. (Doc. No. 10). On March 2, 2015, Petitioner filed a motion for release of documents. (Doc. No. 11). Two days later, she filed copies of some of the documents for which she had been seeking release. (Doc. No. 12.)

## II. THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

### A. Exhaustion

Because Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254. The statute requires that before seeking habeas corpus relief, the petitioner first must exhaust his state court remedies. § 2254(b)(1)(A). To meet the exhaustion requirement, a petitioner must provide the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented through a habeas petition in federal court. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). In other words, "[t]he exhaustion doctrine bars a claim if it is raised for the first time in a federal habeas petition." Mickens v. Taylor, 240 F.3d 348, 356 (4th Cir. 2001) (en banc).

To fairly present the claim, a petitioner must present to the state courts "both the operative facts and the controlling legal principles" associated with each claim. Baker v. Corcoran, 220 F.3d 276, 289 (4th Cir. 2000) (citation omitted). To satisfy this requirement, the claim must "be presented face-up and squarely." Mallory v. Smith, 27 F.3d 991, 995 (4th Cir. 1994) (citation and internal quotation marks omitted). A federal habeas court may not review an unexhausted claim for which state remedies remain available.

### B. Procedural Default

"A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998). One way in which procedural default occurs is when "a habeas petitioner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Id. (internal quotation

marks omitted). In other words, there is no longer a procedure available to the petitioner to exhaust his claims in the state courts. A federal district court may review a claim that is procedurally defaulted upon a showing of cause (e.g. some external factor impeded Petitioner's ability to comply with the State's procedural rule) and prejudice, or that failure to consider the claims will result in a fundamental miscarriage of justice (i.e. the incarceration of someone who is actually innocent). See McCarver v. Lee, 221 F.3d 583, 588 (4th Cir. 2000) (citing Coleman v. Thompson, 501 U .S. 722, 750 (1991)).

### C. Mixed Petitions

In Rose v. Lundy, the Supreme Court held that federal district courts may not adjudicate habeas petitions containing both exhausted and unexhausted claims. 455 U.S. 509 (1982). Accordingly, federal courts that received a "mixed" habeas pe tition were required to dismiss the entire petition without prejudice and allow the petitioner to return to state court to present the unexhausted claims to that court in the first instance. See id. at 522.

AEDPA maintained Lundy's "total exhaustion" requirement, see § 2254(b)(1)(A), but also imposed a 1-year statute of limitations on the filing of federal petitions, § 2244(d). Although the limitations period is tolled during the pendency of a "properly filed application for State post-conviction or other collateral review," § 2244(d)(2), the filing of a petition for habeas corpus in federal court does not toll the statute of limitations, see Duncan v. Walker, 533 U.S. 167, 181-182 (2001). As a result, petitioners who file "mixed" petitions in federal court run the risk of losing their opportunity for any federal review of their unexhausted claims.

In Rhines v. Weber, the Court addressed a post-AEDPA situation in which the petitioner filed a "mixed" habeas petition in federal district court. 544 U.S. 269 (2005). Had the district court dismissed the petition because it contained unexhausted claims, AEDPA's 1-year statute of

7

limitations would have barred Rhines from returning to federal court after exhausting the previously unexhausted claims in state court. Id. at 275. The Rhines Court held that when a district court is presented with a habeas petition containing both exhausted and unexhausted claims, it may "stay the petition and hold it in abeyance while the petitioner returns to state court to exhaust his previously unexhausted claims." Id. at 275-76. Such a stay and abeyance is appropriate only where a petitioner shows: (1) "good cause for his failure to exhaust"; (2) "his unexhausted claims are potentially meritorious"; and (3) "there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." Id. at 278.

## III. DISCUSSION

The instant habeas petition raises both exhausted and unexhausted claims. Grounds Two (2) and Four (4) challenge the sufficiency of the State's evidence to prove that Petitioner acted with premeditation and deliberation when she killed Cannon. (Pet. 7-8, 11, Doc. No. 1.) On direct review, Petitioner challenged, and the North Carolina Court of Appeals addressed, the sufficiency of the evidence to prove premeditation and deliberation. See Bajja, 2013 WL 2431039 at *3-7. Presumably, Petitioner also raised this issue in her PDR as Respondent does not raise an exhaustion or procedural default defense with respect to this claim. (Resp't's Mem. in Support of Summ. J. Mot. 16-24, Doc. No. 7.) Therefore, this issue was fully exhausted in the state courts.

Additionally, Petitioner raises three Sixth Amendment claims in the instant Petition. The first alleges ineffective assistance of counsel for failing to subpoena Cecilia Moses for trial. ("Ground One," Pet. 6, Doc. No. 1.) The second alleges ineffective assistance of counsel for failing to request a change of venue due to the high profile nature of the trial. ("Ground One," supra.) The last alleges that Petitioner's right to a fair trial was violated when a member of the

8

venire was allowed to be seated as a juror despite his stated opposition to homosexual relationships. ("Ground Three," Pet., supra, at 9.) Respondent contends that all three claims are procedurally defaulted on federal habeas review because Petitioner did not exhaust them in the state courts, and they would be procedurally barred under state law if she attempted to exhaust them now.

It is clear from the record that Petitioner did not present "the operative facts and the controlling legal principles" associated with any of the Sixth Amendment claims in the state courts. See Baker, 220 F.3d at 289. Therefore, Respondent is correct that these claims were not exhausted in the state courts before Petitioner filed the instant Petition. The Court disagrees, however, that all three are procedurally defaulted on federal habeas review.

As noted, one way in which procedural default occurs is when "a habeas petitioner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Breard, 134 F.3d at 619 (4th Cir. 1998). If Petitioner attempted to return to state court to exhaust her fair trial claim, it would be procedurally barred in the state courts. See, N.C. Gen. Stat. N.C. Gen. Stat. § 15A-1419(a)(3)[2]. Jury selection was recorded and a transcript made. Had this issue been raised on direct appeal, the appellate court would have been able to review the entire voir dire of the juror who is alleged to have been biased. No further investigation was required in order for the state appellate court to review the merits of the claim. See N.C. R. App. P. 9 ("In appeals from the trial division of the General Court of Justice, review

---

[2] North Carolina's procedural bar statute provides, in relevant part, that a claim shall be denied when the defendant was in an adequate position to have raised it in a previous appeal but did not do so, absent a showing of cause and prejudice or fundamental miscarriage of justice, (i.e., actual innocence). N.C. Gen. Stat. §§ 15A-1419(a)(3) and (b) (2011).

9

is solely upon the record on appeal, the verbatim transcript of proceedings, if one is designated, and any other items filed pursuant to this Rule 9."). Therefore, the fair trial claim could have been raised on direct appeal.

The same is true of Petitioner's claim that trial counsel was ineffective for failing to seek a change of venue. If voir dire does not indicate "such hostility to [a defendant] by the jurors . . . as to suggest a partiality that could not be laid aside," then pretrial publicity has not deprived the defendant of a fair trial. Murphy v. Florida, 421 U.S. 794, 800 (1975). Had this claim been raised on direct appeal, the appellate court would have been able to review the entire jury selection transcript for evidence of hostility toward Petitioner. A review of the transcript would have revealed that at least half of those on Petitioner's jury had not heard or seen anything about the case. (Trial Tr. 42, 69, 123, 135, 169, Resp't's Ex B-1, Doc. No. 7-3; Trial Tr. 207, 244, Resp't's Ex. B-2, Doc. No. 7-4.) None of the other jurors expressed hostility toward Petitioner or preconceived notions of guilt based upon anything they had seen or read. Consequently, the record was sufficient for the appellate court to decide whether trial counsel rendered ineffective assistance by not seeking a change of venue based upon pretrial publicity. See State v. Fair, 557 S.E.2d 500, 524 (N.C. 2001) ("[Ineffective assistance of counsel] claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required."). This Sixth Amendment claim, therefore, could have been raised on direct appeal.

Because Petitioner did not raise either her fair trial claim or the just-discussed ineffective assistance of counsel claim on direct appeal when she was in an adequate position to do so, they would be procedurally barred under state law if she attempted to raise them now. See § 15A-1419(a)(3). Consequently, these claims are procedurally defaulted here. See Breard, 134 F.3d at 619.

10

Finally, Respondent contends Petitioner's claim that counsel was ineffective for failing to call Cecilia Moses as a defense witness also would be procedurally barred by § 15A-1419(a)(3), if Petitioner returned to state court and attempted to exhaust it. However, "§ 15A–1419 is not a general rule that any claim not brought on direct appeal is forfeited on state collateral review. Instead, the rule requires North Carolina courts to determine whether the particular claim at issue could have been brought on direct review." Fair, 557 SE.2d at 525 (quoting McCarver v. Lee, 221 F.3d at 589) (emphasis added).

The defense's theory at trial was that Petitioner did not kill Cannon with premeditation and deliberation. Cecilia Moses was directly involved in every incident between Petitioner and Cannon up to and including the shooting, and she was with them until police arrived. Yet, neither the State nor the defense called her as a witness. Thus, how Moses would have testified is unknown. There is nothing in the record to indicate whether counsel made a strategic decision not to call Moses and the extent, if any, to which that decision prejudiced Petitioner. Therefore, this Court cannot agree with Respondent that Petitioner was in an adequate position to raise her ineffective assistance of counsel claim on direct appeal.

At this stage of the proceedings and based on the record before it, the Court cannot find that Petitioner would be precluded by § 15A–1419 from raising this claim in a collateral state court proceeding by way of a motion for appropriate relief ("MAR"). Cf., State v. Moran, 758 S.E.2d 902, 2014 WL 1457811 at *4 (N.C. Ct. App. 2014) (unpublished) (concluding ineffective assistance claim based upon counsel's failure to procure expert witness better addressed through MAR); State v. Godwin, 698 S.E.2d 202, 2010 WL 2826974 (N.C. Ct. App. 2010) (unpublished) (concluding IAC claim more properly addressed in MAR where it was unclear from the record whether counsel was previously aware of State's surprise witnesses, or how their appearance

11

affected counsel's strategy); State v. Wiggins, 697 S.E.2d 524, 2010 WL 2652249 (N.C. Ct. App. 2010) (unpublished) (IAC claim based, in part, upon counsel's failure to call witnesses better addressed through MAR).  Therefore, this Sixth Amendment claim is not procedurally defaulted on federal habeas review, but it does remain unexhausted.  Because Petitioner has raised both exhausted and unexhausted claims in the instant Petition, this Court must determine whether to "stay and abey" the instant Petition so that Petitioner may return to state court to exhaust this claim, see Rhines, 544 U.S. at 275-76, or dismiss the entire Petition without prejudice pursuant to Lundy, 455 U.S. at 522.

Petitioner's judgment of conviction became final on November 25, 2013, 90 days after the North Carolina Supreme Court denied her PDR and her time for filing a petition for writ of certiorari in the United States Supreme Court expired.  See Clay v. United States, 537 U.S. 522, 525 (2003).  She timely filed the instant Petition on September 30, 2014, when it was received in the district court. (Envelope, Doc. No. 1-2.)  However, because the filing of a petition for habeas corpus in federal court does not toll the statute of limitations, see Duncan v. Walker, 533 U.S. at 181-182, Petitioner's statute of limitations continued to run until November 25, 2014, when it finally expired, see § 2244(d)(1)(A).  Thus, absent equitable tolling, see Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005), or a credible showing of actual innocence, see McQuiggin v. Perkins, 133 S.Ct. 1924, 1928 (2013), a future petition for writ of habeas corpus raising fully exhausted claims will, more likely than not, be time-barred.

On the other hand, a stay and abeyance is appropriate only where a petitioner shows: (1) "good cause for his failure to exhaust"; (2) "his unexhausted claims are potentially meritorious"; and (3) "there is no indication that the petitioner engaged in intentionally dilatory litigation

12

tactics." See Rhines, 544 U.S. at 278. Petitioner has not demonstrated "good cause" for her failure to exhaust her ineffectiveness claim.

Petitioner used the standard "PETITION UNDER 28 U.S.C. §2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY" available to state prisoners. (Doc. No. 1.) For each ground raised, there are accompanying questions regarding exhaustion. For Ground One, Petitioner acknowledged that she had not exhausted her state remedies, and offered the following explanations: "I did not know anything about my rights" and "I left all issues in my attorney's trust to be raised in appeal." (Pet., supra, at 6.) Neither of these explanations is sufficient to show "good cause" for failure to exhaust this claim.

As an initial matter, Petitioner would have known as soon as she received a copy of the Defendant-Appellant Brief from her attorney, that the attorney did not raise any ineffective assistance of counsel claims. At the latest, the North Carolina Court of Appeal's opinion should have made it clear that the only claim raised on direct review challenged the sufficiency of the evidence that Petitioner was guilty of first-degree murder. Consequently, several months before her federal statute of limitations began to run, Petitioner knew, or should have known, that her attorney had not raised an ineffective assistance of counsel claim on direct review.

Petitioner's assertion that she "did not know anything about [her] rights" does not constitute "good cause" for her subsequent failure to pursue available state remedies during the thirteen (13) months that elapsed between the denial of her PDR and the filing of the instant Petition. Furthermore, Petitioner has given no indication that she has attempted to exhaust her ineffectiveness claim in the state courts since filing her federal habeas Petition. Because Petitioner has not demonstrated "good cause" for failing to exhaust her ineffective assistance of counsel claim, the Court shall not stay the instant habeas Petition. See Rhines, 544 U.S. at 278.

13

**IV: MOTION FOR RELEASE OF DOCUMENTS**

In response to the Court's <u>Roseboro</u> order, Petitioner filed a motion asking this Court to order certain Mecklenburg and Cabarrus county agencies to provide her documents related to abuse and neglect by her father and sexual assault by a cousin. (Doc. No. 11.) The motion did not state why these documents were relevant to the claims raised in the Petition.

Subsequently, Petitioner sent a letter to the Court, with copies of some of the documents she had been trying to obtain by way of a court-ordered release. (Doc. No. 12.) The documents were copies of criminal records related to the conviction of Petitioner's cousin for taking indecent liberties with a child; the child was Petitioner. In the letter, Petitioner asserts what can be liberally construed as ineffective assistance of counsel for not introducing these records, records related to abuse of Petitioner by her father, and Petitioner's psychiatric records as evidence of her state of mind before, during, and after Cannon was killed.

Suffice it to say, this claim was not exhausted in the state courts. Petitioner may decide to raise a claim related to these documents by way of an MAR in the Gaston County Superior Court. If so, she may seek a release order from that court. Here, the request is moot in light of the Court's decision to dismiss the Petition.

**V. CONCLUSION**

Because Petitioner's Petition contains both exhausted and unexhausted claims, the Court will dismiss the Petition without prejudice. Petitioner may pursue her unexhausted claims in North Carolina's courts, and if necessary, in this Court thereafter.[3] However, to the extent that

---

[3] The Court offers no opinion regarding whether such a pursuit by Petitioner would be successful procedurally or substantively.

Petitioner prefers to abandon her unexhausted claims and have this Court rule on her exhausted claims now, she may file an appropriate post-judgment motion stating her desire to abandon her unexhausted claims.

**IT IS, THEREFORE, ORDERED** that:

1) Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. No. 1) is **DISMISSED WITHOUT PREJUDICE**;

2) Petitioner's motion for release of documents is (Doc. No. 11) is **DENIED**;

3) Respondent's Motion for Summary Judgment (Doc. No. 6) is **DISMISSED WITHOUT PREJUDICE**;

4) In the event Petitioner wishes to abandon her unexhausted claims, she may inform the Court of that desire through a motion for relief from judgment in accordance with the Federal Rule of Civil Procedure 60(b); and

**5)** Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 474, 484 (2000) (holding that when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition states a debatably valid claim of the denial of a constitutional right).

**SO ORDERED.**

Signed: September 11, 2015

Frank D. Whitney
Chief United States District Judge